**SIGNED THIS: January 04, 2007**

_____
**MARY P. GORMAN**
**UNITED STATES BANKRUPTCY JUDGE**
_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | In Bankruptcy |
| LEPRECHAUN TRUCKING, INC., | ) | |
| | ) | Case No. 05-78104 |
| Debtor. | ) | |
| _____ | ) | |
| JEFFREY D. RICHARDSON, | ) | |
| Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 06-7122 |
| PANA LIMESTONE QUARRY CO., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| JEFFREY D. RICHARDSON, | ) | |
| Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 06-7054 |
| TRUMAN L. FLATT AND SONS | ) | |
| CO., INC., | ) | |
| | ) | |
| Defendant. | ) | |

## O P I N I O N

This matter is before the Court on the Cross-Motions for

-1-

Summary Judgment filed by Plaintiff/Trustee and by the respective Defendants in the above-captioned related adversary proceedings.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(E) and (F).

Leprechaun Trucking, Inc. ("Debtor") filed its voluntary Chapter 7 petition in bankruptcy on October 16, 2005. Jeffrey D. Richardson ("Trustee") was appointed Trustee of Debtor's bankruptcy estate. Debtor was a trucking company and, in the course of its business, purchased crushed limestone for use in road construction projects and for resale. In 2002, Debtor began purchasing crushed limestone from Pana Limestone Quarry Co. ("Pana Quarry" or, collectively with Truman L. Flatt & Sons Co., Inc., "Defendants").

Pana Quarry is owned by David Flatt and is headquartered in Springfield, Illinois. Pana Quarry sells limestone to a number of trucking companies. Charles Brian "Barney" Flatt, who is a cousin to David Flatt, oversees production and sales at Pana Quarry.

David Flatt also owns Truman L. Flatt & Sons Co., Inc. ("Truman Flatt" or, collectively with Pana Quarry, "Defendants"). Truman Flatt shares its headquarters in Springfield, Illinois with Pana Quarry. Truman Flatt is engaged in the construction business, primarily in the area of road construction. In the course of its operations, Truman Flatt hired Debtor to perform hauling services, and Debtor did so on an ongoing basis until several weeks before

its bankruptcy filing.

During the relevant time period, David Flatt's wife, Christine Flatt, worked in the Springfield office of Truman Flatt and Pana Quarry. She oversaw financial operations for both companies. In early 2005, she recognized that a large balance had become due and owing by Debtor to Pana Quarry. She decided to have Truman Flatt, Pana Quarry, and Debtor enter into a three-way payment arrangement.

Christine Flatt asked Barney Flatt to contact Debtor about the arrangement. Barney Flatt called Sandy Lowrance, office manager of Debtor. After the conversation and beginning April 2, 2005, the parties undertook a "check swap" arrangement. Under the arrangement, Truman Flatt would continue to utilize Debtor to perform hauling services and Pana Quarry would continue to sell crushed limestone to Debtor. Truman Flatt would pay Debtor for performing hauling services, but Debtor was to concomitantly pay on its account with Pana Quarry every dollar Truman Flatt would pay to Debtor. The mechanics involved an actual check swap - Sandy Lowrance would go to the Springfield offices of Truman Flatt and Pana Quarry, pick up a check payable to Debtor from Truman Flatt, and deliver a check (or checks) from Debtor payable to Pana Quarry in the same amount. There was more than one occasion when Debtor was permitted to pay to Pana Quarry less than it received from Truman Flatt. In total, the "check swap" occurred on ten occasions.

Following the filing of Debtor's bankruptcy petition on October 16, 2005, Trustee filed two related adversary complaints. On February 15, 2006, Trustee filed his Complaint against Truman Flatt. Trustee alleges that Debtor rendered services to Truman Flatt totaling $33,392, and that that amount has not been paid.[1]

On May 3, 2006, Trustee filed his Complaint against Pana Quarry. Trustee alleges that, within 90 days of the filing of the bankruptcy, Debtor, while insolvent, made payments to Pana Quarry which totaled $99,394.33, and that said payments allowed Pana Quarry to receive more than it would have received in a Chapter 7 bankruptcy case had the transfers not been made.[2]

Pana Quarry and Truman Flatt both assert as a defense their contention that Debtor, in April, 2005, when it entered into the "check swap" arrangement, orally assigned to Pana Quarry all of its rights to future payments from Truman Flatt for trucking services yet to be rendered. Consequently, Defendants argue, the $99,460.33

---

[1]

Trustee concedes in his Motion for Summary Judgment that $2,184.79 of the total constitutes late charges. Trustee waived the late charges and any request for pre-petition interest and, therefore, reduced his demand to $31,207.04. *See* Trustee's Motion for Summary Judgment *at* p. 3.

[2]

Paragraph 5 of Trustee's Complaint states that "[d]uring the preference period, and while the Debtor was insolvent, the Debtor made payments to the **Debtor** which totaled $99,394.33." Actually, the Debtor made payments during the preference period to the Defendant - Pana Quarry. That fact is made manifest in the other pleadings and exhibits filed and is not disputed. Pana Quarry states that it actually received $99,460.33 during the preference period. *See* Answer of Pana Quarry May 19, 2006, p. 2.

-4-

received by Pana Quarry from Debtor during the preference period was absolutely assigned and transferred by the Debtor outside of the preference period and, thus, is not subject to the claim of the Trustee.   Additionally, because of the oral assignment, Truman Flatt argues that any amounts which Truman Flatt owed Debtor at the time of the bankruptcy filing are actually owed to Pana Quarry. Thus, Trustee has no claim against Truman Flatt for said amounts.

Pana Quarry offers a second affirmative defense in response to the Trustee's Complaint filed against it.   Pana Quarry contends that any alleged preferential payments were paid in the ordinary course of business and, thus, are not subject to avoidance as preferential by the Trustee.

Trustee, Pana Quarry, and Truman Flatt have all filed Motions for Summary Judgment.   As set forth above, the issue of whether the "check swap" created an absolute assignment which defeats the Trustee's rights is common to both cases and is raised by all parties in their summary judgment motions.

Defendants argue that oral assignments are recognized as valid under Illinois, and that the funds claimed by the Trustee in both cases were subject to a valid oral assignment.   According to the Defendants, as of April 2, 2005 - the date the "check swap" arrangement was put into place - Pana Quarry acquired all of Debtor's rights to payments to become owing to Debtor by Truman Flatt.   Consequently, they argue that the implementation of the

-5-

"check swap" constituted an absolute and irrevocable transfer of Debtor's rights in and to said funds, or right to receive said funds.

Trustee disputes the contention that the parties have a valid oral assignment.  At most, Trustee contends, the record shows that the parties entered into an informal arrangement where, between April, 2005, and September, 2005, checks were exchanged by mutual assent.  However, Trustee proffers, the record also shows that on not every occasion was there an even swap, and that fact is evidence of the absence of a true assignment.  Finally, Trustee contends that the "check swap" arrangement may have been an attempt to create a security interest with respect to future accounts receivable owed to Debtor from Truman Flatt.  However, to be enforceable against the Trustee, the security interest would have to have been in writing and a financing statement would have to have been filed to perfect the secured interest. No such documents exist.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Bankr.P. 7056, incorporating by reference Fed.R.Civ.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552 (1986).

Summary judgment will be granted only where it is clear that there
is no dispute about the facts or inferences to be drawn therefrom.
Central Nat. Life Ins. Co. v. Fidelity and Deposit Co. of Maryland,
626 F.2d 537, 539 (7th Cir. 1980) *citing* U.S. v. Diebold, Inc.,
369 U.S. 654, 655, 82 S.Ct. 993, 994 (1962).  On a motion for summary
judgment, the court must view the evidence in the light most
favorable to the non-moving party.  In re Chambers, 348 F.3d 650,
654 (7th Cir. 2003).  It is not the role of the trial court to weigh
the evidence or to determine its credibility, and the moving party
cannot prevail if any essential element of its claim for relief
requires trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
249, 106 S.Ct. 2505, 2511 (1986).  The movant bears the burden to
prove each fact material to its claim and to establish that each
fact is not in genuine dispute.  If the movant fails to make that
showing, summary judgment is not proper and must be denied.  *See* In
re Rogstad, 126 F.3d 1224, 1227-28 (9th Cir. 1997).

"The primary purpose of granting a summary judgment motion is
to avoid unnecessary trials when there is no genuine issue of
material fact in dispute."  In re JII Liquidating, Inc, 341 B.R.
256, 263 (Bankr. N.D. Ill. 2006).  Where the material facts are not
in dispute, the sole issue is whether the moving party is entitled
to a judgment as a matter of law.  ANR Advance Transp. Co. v.
International Brotherhood of Teamsters, Local 710, 153 F.3d 774,
777 (7th Cir. 1998).  The entry of summary judgment against a party

-7-

is mandated, if, after adequate time for discovery and upon motion, that party fails to make a showing sufficient to establish the existence of an element essential to that party's case.  <u>Celotex Corp. v. Catrett</u>, *supra*, 477 U.S. *at* 322, 106 S.Ct. *at* 2552.

An "assignment" is a transfer of some identifiable property, right, claim, or interest, from the assignor to the assignee.  An equitable assignment is an assignment that gives the assignee a title which, although not cognizable at law, equity will recognize and protect.  <u>National Bank of Albany Park in Chicago v. Newberg</u>, 7 Ill.App.3d 859, 866, 289 N.E.2d 197, 202 (Ill. App. 1972).

An assignment operates to transfer to the assignee all of the assignor's right, title, or interest in the thing assigned; the assignee, by acquiring the same rights as the assignor, stands in the shoes of the assignor.  <u>In re Estate of Martinek</u>, 140 Ill.App.3d 621, 629-30, 488 N.E.2d 1332, 1337-38 (Ill. App. 1986) (citations omitted).  There must be a present transfer of the assignor's right, which is so far complete as to deprive the assignor of his or her control over the subject of the assignment, and the assignor must not retain any power of revocation.  6A C.J.S. *Assignments* §57 (2006)(citations omitted).  An assignor no longer has any rights in the property assigned.  <u>People v. Wurster</u>, 97 Ill.App.3d 104, 106, 422 N.E.2d 650, 652 (Ill. App. 1981) (citation omitted).

Assignments are to be interpreted in the same way as any other

contract.  *See* <u>Lowrance v. Hacker</u>, 888 F.2d 49, 51 (7th Cir. 1989),
*citing* <u>Advance Process Supply Co. v. Litton Ind. Credit Corp.</u>, 745
F.2d 1076 (7th Cir. 1984).   Oral assignments are valid, unless
expressly prohibited by statute.   <u>Strosberg v. Brauvin Realty
Services, Inc.</u>, 295 Ill.App.3d 17, 30, 691 N.E.2d 834, 843 (Ill.
App. 1998), *citing* <u>In re National Tire Services, Inc.</u>, 201 B.R. 788
(Bankr. N.D. Ill. 1996).   When there is no writing to evidence the
intention to transfer some identifiable property, claim, or right,
it is necessary to scrutinize the surrounding circumstances and the
acts of the parties to ascertain their intentions.   <u>Strosberg v.
Brauvin Realty Services, Inc.</u>, *supra*, 295 Ill.App.3d *at* 30, 691
N.E.2d *at* 844 (citation omitted).

     Lack of formality in an assignment may mean that the
assignment is revocable, or that it is subject to the defenses or
claims of the obligor which accrue subsequently, or that it can be
defeated by creditors of the assignor or by subsequent assignees of
the same right.   6 Am.Jur.2d *Assignments* §121 (2006), *citing*
Restatement (Second) of Contracts 2d §324, Comment a.

     The deposition testimony of all of the individuals involved in
the check swap on behalf of all of the participants was submitted
with the summary judgment motions.   It is clear that there is no
factual dispute as to how the check swap was originally arranged
or how it was carried out.  Brief conversations were had by various
individuals about the Debtor using the proceeds earned from Truman

-9-

Flatt to pay Pana Quarry.  No one used the term "assignment" or any other relevant legal term in the conversations and no paperwork was created to memorialize the agreement.   The parties merely agreed that when Truman Flatt paid Debtor, Debtor would pay Pana Quarry.

When money was due to Debtor by Truman Flatt, it was paid by Truman Flatt to Debtor.  At the time the payment was made, Sandy Lowrance would deliver a check or checks of like amount to Pana Quarry.  Occasionally, the procedure varied when Debtor had bills to pay and could not devote the entire proceeds from Truman Flatt to pay Pana Quarry.

Based on these undisputed facts, at most, the parties made an oral agreement to use the "check swap" to pay down debt to Pana Quarry.  There is nothing in the record to support the contention that Debtor relinquished and Pana Quarry acquired the rights to future payments which became due to Debtor from Truman Flatt. Further, to the extent that the "check swap" constituted an oral agreement between the parties, it was subject to exception when Debtor could not pay all the funds it received from Truman Flatt to Pana Quarry.

The record, even when viewed in a light most favorable to the Defendants, cannot sustain a finding that a valid assignment occurred here.  The "check swap" arrangement does not bear any of the markings of an absolute, unconditional transfer of Debtor's rights.  Debtor did not relinquish to Pana Quarry any interest in

-10-

its accounts receivable from Truman Flatt.  Rather, Debtor engaged in a revocable-at-will arrangement which allowed it to continue doing business with Defendants.  If Debtor had ceased the "check swap" and stopped doing business with Defendants, Debtor would still have an enforceable claim against Truman Flatt for any amounts owing to Debtor for services provided.  In addition, if, hypothetically, a non-wage garnishment had been served on Debtor's bank after Debtor had deposited a check from Truman Flatt but before Debtor's corresponding check to Pana Quarry had cleared, the garnishment would be executed against those funds in Debtor's account, and Pana Quarry would have no claim superior to that of the garnishing creditor.

If an absolute assignment had occurred, then Debtor would have given up its right to be paid directly and Truman Flatt would have had a legal obligation to pay Pana Quarry directly.  Likewise, Pana Quarry would have had an enforceable right to collect directly from Truman Flatt.  Nothing in the parties' conduct as testified to by the Defendants' own witnesses supports a finding that any of the parties acted as though they had agreed to an absolute assignment. To the contrary, Truman Flatt always paid Debtor directly after the "check swap" agreement was made, and that fact clearly evidences that the "check swap" agreement was not an assignment at all.

For the reasons set forth above, the Court finds that summary judgment should be granted in favor of Trustee and against

-11-

Defendants in each adversary proceeding on the question of whether Debtor's rights to payments from Truman Flatt for services rendered were the subject of a valid oral assignment.  This finding is dispositive of the Truman Flatt adversary but a second defense of ordinary course of business is raised by Pana Quarry and must also be addressed.

The Trustee's preference action against Pana Quarry is based on Section 547(b) which provides as follows:

> (b)   Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property-
>
> (1)   to or for the benefit of a creditor;
>
> (2)   for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3)   made while the debtor was insolvent;
>
> (4)   made-
>
> (A)   on or within 90 days before the date of the filing of the petition; or
>
> (B)   between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5)   that enables such creditor to receive more than such creditor would receive if-
>
> (A)   the case were a case under chapter 7 of this title;
>
> (B)   the transfer had not been made; and

> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. §547(b).[3]

Payments of $99,460.33 were made to Pana Quarry by Debtor within the ninety days prior to the bankruptcy filing on October 16, 2005. Therefore, the transfers took place within the preference period. Other than Pana Quarry's general denial for insufficient knowledge, no one disputes, and nothing in the record refutes, that Debtor was insolvent at the time the transfers were made. The transfers were for antecedent debts, i.e. unpaid invoices for goods previously sold and delivered. The transfers allowed Pana Quarry to receive more than it would have received had the transfers not been made. *See* Affidavit of Jeffrey D. Richardson dated September 5, 2006.

The ordinary course of business defense raised by Pana Quarry is set forth at §547(c)(2) as follows:

> (c) The trustee may not avoid under this section a transfer—
>
> * * * *
>
> (2)  to the extent that such transfer was—

---

[3]

The Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") generally became effective with respect to cases filed on or after October 17, 2005. Because this case was filed on October 16, 2005, BAPCPA does not apply. All references to the Bankruptcy Code herein are to the pre-BAPCPA Code.

> (A)    in payment of a debt
> incurred by the debtor in the
> ordinary course of business or
> financial affairs of the debtor and
> the transferee;
>
> (B) made in the ordinary
> course of business or financial
> affairs of the debtor and the
> transferee; and
>
> (C) made according to ordinary
> business terms[.]

11 U.S.C. §547(c)(2).

A creditor asserting the defense has the burden to prove each element by a preponderance of the evidence.  11 U.S.C. §547(g); Matter of Midway Airlines, Inc., 69 F.3d 792, 797 (7th Cir. 1995). If the creditor fails to prove any of the three elements, the defense is inapplicable.

The parties do not dispute that the transfers were made in payment of debts which were incurred in the ordinary course of business of Debtor and Pana Quarry.  The dispute is whether the payments were made in the ordinary course of business of the Debtor and Pana Quarry and according to ordinary business terms.

The purpose of the ordinary course of business defense is "to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R. Rep. No. 595, 95th Cong. 1st Sess. 373 (1977); S. Rep. No. 989, 95th Cong. 2d

-14-

Sess. 88 (1978).   As one court explained, "the ordinary course exception to the preference rule is formulated to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy".   In re Molded Acoustical Products, Inc., 18 F.3d 217, 219 (3rd Cir. 1994) (citations omitted).   Another court has held that the ordinary course of business defense was designed to "leave undisturbed normal commercial and financial relationships and protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of both the debtor and the debtor's transferee."   Kleven v. Household Bank F.S.B., 334 F.3d 638, 642 (7th Cir. 2003), quoting In re Armstrong, 231 B.R. 723, 729 (Bankr. E.D. Ark. 1999), aff'd 260 B.R. 454 (E.D. Ark. 2001).

Section 547(c)(2)(B) is a subjective test based upon the course of dealings between the debtor and the transferee.   In re Garofalo's Finer Foods, Inc., 186 B.R. 414, 428-29 (N.D. Ill. 1995).   In determining whether transfers are ordinary in relation to the past practices of the parties, the Court must look at a number of factors, including the following:

1.   the length of time the parties were engaged in the transactions at issue;

2.   whether the amount or form of tender differed from past practices;

3.   whether the debtor or creditor engaged in any unusual collection or payment activity, and

4.    whether the creditor took advantage of the debtor's
deteriorating financial condition.

In re Grand Chevrolet, Inc., 25 F.3d 728, 732 (9th Cir. 1994).  The
twelve-month  period  preceding  the  preference  period  is  an
appropriate  standard  for  determining  the  ordinary  course  of
business between parties.  *See* Lovett v. St. Johnsbury Trucking,
931 F.2d 494, 498 (8th Cir. 1991); In re Bank of New England Corp.,
161 B.R. 557, 560 (Bankr. D. Mass. 1993).

Debtor began doing business with Pana Quarry in 2002.  The
"check swap" arrangement was commenced in April, 2005.  Debtor's
bankruptcy petition was filed in October, 2005.  All of the alleged
preferential payments were made after the implementation of the
"check swap" arrangement.

Without question, the "check swap" arrangement differed from
past practices and constituted an "unusual" payment or collection
activity.  None of Pana Quarry's other 20 customers was subject to
such  an  arrangement,  and  Debtor  was  not  subject  to  such  an
arrangement until April, 2005, when its payables to Pana Quarry
became so far past due as to raise serious concern.  Debtor did not
pay any of its other creditors by "check swap."

It  is  clear  that  Pana  Quarry  took  advantage  of  Debtor's
deteriorating financial condition to pressure Debtor into the
"check swap" arrangement.  Debtor was advised that agreeing to the
"check  swap"  was  a  condition  precedent  for  continuing  to  do
business with both Pana Quarry and Truman Flatt.  Given Debtor's

-16-

precarious financial condition at the time, Debtor had no choice but to acquiesce to the "check swap". Payments made as a result of economic pressure are not made in the ordinary course of business. In re Carini, 245 B.R. 319, 324 (Bankr. E.D. Wis. 2000). Accordingly, viewing the record in a light most favorable to Pana Quarry, the Court finds that the payments made by Debtor to Pana Quarry during the preference period were not made in the ordinary course of the business or financial affairs of Debtor and Pana Quarry.

Section 547(c)(2)(C) is an objective test based upon industry practices or standards. In re Daedalean, Inc., 193 B.R. 204, 214 (Bankr. D. Md. 1996). The Bankruptcy Code does not define "ordinary business terms". However, the Seventh Circuit has held that "'ordinary business terms' refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection (c)". In re Tolona Pizza Products Corporation, 3 F.3d 1029, 1033 (7th Cir. 1993)(emphasis in original).

It is difficult to understand how a "check swap" arrangement could fall within the range of "ordinary business terms". Pana Quarry suggests that many of the "check swap" payments were made within 120 days of when they became due, which is within the range

-17-

of ordinary payment terms in its industry.  That may well be the case.  However, payment within 120 days is not the only business term agreed to by the parties which must be "ordinary" in order for Pana Quarry to prevail.   Here, the payment terms were also that the Debtor would generally pay Pana Quarry in the same amounts and on the same dates as Debtor received payments from Truman Flatt.  Pana Quarry does even suggest that ordinary business terms would include having the dates and amounts of payments due on an obligation be determined by receipts from a third party.

The "check swap" simply cannot be an ordinary business term because businesses could not exist if they were required to pay all receipts from specific customers to specific creditors.  Businesses need to be able to pay their employees, taxes, utilities and other overhead expenses from their receipts.  A "check swap" is an extraordinary collection arrangement and not an ordinary business term.

Because as a matter of law the "check swap" payments were not made in the ordinary course of the Debtor's or Pana Quarry's business, and because a "check swap" is not an ordinary business term, summary judgment will be entered in favor of Trustee and against Pana Quarry on Trustee's preference claim.

Trustee's Motions for Summary Judgment pray for costs of suit.  Costs "shall be allowed as of course to the prevailing party unless the court otherwise directs[.]"  Fed.R.Bankr.P. 7054(d).  Thus,

-18-

Trustee's requests for costs are allowed.

Trustee's Complaints prayed for pre-judgment interest. Trustee did not, however, request pre-judgment interest in his Motions for Summary Judgment.  Accordingly, the Court does not award pre-judgment interest.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Orders.

###